Let me know if I pronounced that name correctly. Good morning. May it please the Court, Jonathan Libby appearing on behalf of Appellant Aldoberto Tablada Datan. Your Honors, as an initial matter, I would note that the government has agreed that a remand must be ordered in this case with the District Court's refusal to give notice of the conditions of release that were imposed. Notice was required under Rule 32, and as this Court has discussed in United States v. Wise, it was the only opportunity Mr. Datan would have had to litigate any of the conditions of release, and the government agrees that we do at least have to have a remand. Yes, we're aware of that from the Papers Council. The other issue in this case, Your Honor, is the restitution order. And with respect to restitution, there are many problems. First, Your Honor, the restitution order includes money for things that are simply not authorized by the restitution statute. One thing I noticed, your brief says that the $7,000 of restitution was to cover the cost of management and supervision of a caseworker. Where does that appear in the record? Because I found a different number. Okay. Your Honors, Your Honor, the excerpts, if you look from 211 to 218, as I added up, the Court ordered caseworker fees in the amount of $558 for each of the eight victims, and then at the very end ordered a 15% management fee of $2,383, which I count as somewhere around $6,860, $6,900. The restitution order included money here for cell phone repair training and management skill training, which is not covered by the applicable restitution statute. The government, I think, tries to get it under the statute by continuously referring to it as occupational therapy, which is covered under the statute, but vocational training is simply not the same thing as occupational therapy. Occupational therapy involves providing therapeutic services by a trained health professional. We cite to several definitions in our brief. I'd also suggest to the Court it takes a look at the website for the American Occupational Therapy Association, which discusses what occupational therapy is. Job training is not occupational therapy. And there's certainly no evidence in this case that any of this management skills training or cell phone repair training was going to be conducted by an occupational therapist or that an occupational therapist had even suggested that this be imposed. The government also failed to introduce evidence to establish with any type of reasonable certainty what the specific losses were in this case that were the proximate result of Mr. Dayton's crime. With respect to, again, the job training and management skills, no evidence that these, in fact, were losses that were caused by the crime. Well, I struggle with your proximate cause argument relative to the counseling. Clearly, the other cases that we have, the counseling is much more. It's a fairly minimal amount. I think, what is it, for two years? Once a month for two years for each of the victims. And that's the eight victims that were located out of the 18. Given what the offense is, it's almost common sense that it would require some counseling. I just, you know, that one I have difficulty with that you're making. I understand, Your Honor. I guess our problem here is that the government simply did not submit any evidence as to the necessity for it. I certainly understand Your Honor's position that perhaps just from a common sense perspective, each of these victims likely suffer some type of psychological, need some type of psychological counseling. I don't know, however. There was simply no evidence submitted that they had been evaluated by a psychologist in the first place. This is for future. This is based on an estimate of future costs. And we don't know if this type of trauma counseling is going to be necessary for the entire length of time or that the amount applies equally to each of the eight victims. So that was our issue with respect to the psychological treatment. With respect to the medical treatment, the government, again, introduced no evidence with respect to the necessity of medical treatment. For the first time at the restitution hearing, there was some mention of the need to have them tested for sexually transmitted diseases. Though the government acknowledged they hadn't been tested, they hadn't been seen by a doctor, and that there, in fact, was no evidence that there, in fact, was any medical need. And, again, under this Court's decision in Laney, the government has to submit sufficient evidence that a court has reasonable certainty that the losses were the proximate result of the offense. The court then tried to, in fact, limit the order for medical assistance by saying, it can't be used for any medical treatment that's not a proximate cause of the offense. But, of course, there was no change in the amount of the restitution. And the court just simply said, all right, I'm just going to accept the figure and order it. Even though, again, there was just no evidence of it. I do have a question about each case that you cite interprets Rule 32C before its revision. Do the 2002 revisions to Rule 32 affect your argument about the district court's compliance in any way? With respect to the supervised release conditions or with respect to the restitution? Well, any of your arguments. I don't believe it does. I believe the most recent amendments to Rule 32 were simply cosmetic, for the most part, that it was not intended to change any of the prior Rule 32s that had been in effect. Counsel, this is the first restitution case I've seen where the victims are all overseas in the Philippines, these children who were the subjects of the child pornography. Is there any consideration that we should give one way or the other with respect to looking at this from the standpoint of the relatively minimal expenses that are relevant to the treatment of these children overseas compared to what they would have been if this all had happened in the United States? The short answer is no. The statutes itself, the 2259 and 3664, both discuss how the relevant economic circumstances of the particular victims are just completely not relevant to a determination of restitution. I understand what the government is trying to do here in terms of helping out these victims and the difficulty in trying to come up with some type of restitution plan, for example. Is there anything in the restitution categories that is different because this is all going on in the Philippines as opposed to what it would have been if it were in Southern California, let's say? I don't believe so. All right. I don't believe so. Okay. The general purpose of restitution remains the same, regardless of where the victims may be. It's to restore the victims to their prior state of well-being. It's not to try to advance them beyond what they were before, which I think what the government's order was to request was trying to do here. And, in fact, the Court, even discussing some of the educational costs that he ordered, such as school supplies and snacks and those kind of things, saying that they were completely nominal, well, again, the fact that they may be nominal is irrelevant to the order. And with that, I'm going to reserve the balance of my time. You may do so, counsel. We'll hear from the government. Thank you. Good morning, Your Honors. May it please the Court, Rupa Goswami for the government. The defendant in this case pled guilty and admitted to sexually abusing eight children in the Philippines. As part of his plea agreement, he agreed to pay restitution to these eight children. Now, the defendant claims that the district court was overly generous and also approved certain types of assistance, namely vocational training and educational assistance that were outside the statute. Now, I would like the Court to keep in mind the context in which these crimes were committed. In 2004, when Mr. Dayton traveled to the Philippines to have sex with children, these kids were only 14 and 15 years old. They were teenagers raised in a largely Catholic country, and they were subjected repeatedly to homosexual abuse at the hands of an elderly, wealthy American. Simply put, these children are permanently scarred, and no amount of money will make them whole. In a few short months, they went from being outgoing children that performed at dance performances to being social pariahs. Now, the government provided extensive evidence not only of the damage that they suffered from three different sources, but also they provided a package of restitution assistance in the name of therapy, social worker assistance, vocational training, and educational assistance. For what? To allow these children to reintegrate into society. Well, I made the comment that it sort of seems common sense that children in that situation would need some sort of counseling or that that would be appropriate. But, you know, taking the other side of it, what specific evidence supports your contention that future psychological counseling is necessary? Well, Your Honor, what the government did is it had these children evaluated basically three times. First, the defendant was arrested in November of 2004. We found only eight of his 18 victims in January. And in January and February, they were interviewed, and that interview was videotaped by the Department of Child Services in the Philippines. Then in April, we had victim statement forms, which are the standard forms we use here in the United States, taken to the children, and they sat and they filled those forms out with their parents present. Then in June of 2005, three months before the restitution hearing, the World Vision Foundation started having weekly visitations with the families and the children to determine the level of assistance that they would need. And this evaluation was done by a professional social worker who is trained in evaluating child sexual abuse trauma. In addition, I'm... Is there an entity in the United States that performs this same kind of service that we've recognized in the past? Well, if we were doing this in the United States, we would probably just depend on, like the Los Angeles County Department of Child and Social Services. That was probably what we would go to. But we don't have that, we didn't have that luxury in this case. And therefore, what we did is we picked an international organization that was originally founded in the Philippines and had a lot of ground support there in the Philippines. These children also were not in Manila, they're not in the capital, they're way out in Cebu. And that's why, for instance, there are these additional expenses that seem odd, such as transportation, because the caseworker actually had to travel to visit each of these families. And in addition, we tried to set up the restitution so that the caseworker would be responsible for transporting the kids to the medical treatments, to the therapist. And again, as Your Honor noticed, the therapy was only set up for once a month for a period of two years. And that is a very conservative approach. The government in this case is not asking for lifetime therapy, as the court granted in the Danzer case. We're asking for a very limited period. We're asking for only once a month. And in addition, we're narrowing the restitution to include only direct support for the victims themselves. Not their entire families. Now, I think that you did ask, but I think the court disallowed it. Someone wanted to start up a business, or they wanted to start up a business. So, you know, I think that would be, you know, I mean, that would cause, I mean, that does seem overbroad. The district court obviously saw it that way, but that was part of what the government was asking. So does that put an askance eye on the other things that the government was asking? I don't think so, Your Honor. I mean, I think what the goal in this case was we're in an unusual situation. We have teenage boys who basically in response to this sexual abuse, they have a textbook reaction. They drop out of society. They start committing crimes. They no longer go to school. And the main goal was that. Well, that on the cutting on school, you know, a lot of teenagers cut school and nothing's happened to them. Is that, you know, do we need a nexus there? Or is that just part of, did you look at that in the totality? Well, Your Honor, I do believe there is a nexus. I mean, the victim statements in this case, the children state over and over again that they cut school, that they stopped going to school largely because they were being ridiculed for having been involved in homosexual sex acts with an adult person. I mean, they're not cutting school because they have more fun things to do. They're cutting school because they're overwhelmed with guilt and shame and feelings of worthlessness. And the thought was to try and find a way to provide them with some basic amount of assistance to allow them to be reintegrated into society. And the government was careful. I mean, for instance, about half of the victims in the victim statement referenced the fact that they had family economic loss due to this abuse that Mr. Deton visited upon them. They mentioned a father or a mother or a grandmother who then spent all of their time monitoring this child or going to meet with authorities. Now, we did not include a request for family economic loss, although it's clearly included in the statute. And that's largely because these families weren't sophisticated enough to quantify that loss. And therefore, we restricted our request to only those items which could be documented and to specific dollar amounts which could be sustained by the World Vision Report. I'd also like to note that World Vision was actually very generous in its support of this restitution package. The three months that the social worker met with the families on a weekly basis and traveled to do home visits, none of those costs were included in the restitution amount requested of Mr. Deton. So you didn't cross appeal the denial of the initial startup capital point? No, Your Honor, we did not cross appeal for that. We understood the district court's ruling on that. Personally, I still felt that part of what made these children so vulnerable was the fact that they were so extremely poor. And Mr. Deton certainly knew that going into this situation. And I would argue, Your Honor, that he is getting a tremendous windfall in this case. Because these services are being provided in a developing country, they are remarkably cheap. $18 for two to six hours with Dr. Mitch Boot. The cost for the social worker for two years to visit on a weekly basis with these families comes to about $3,400. I'm afraid I still don't understand quite where the $7,000 come from that Mr. Libby mentions. There is a management fee. So the total amount is $16 something, right? Yes, the total amount of restitution is $16,475, Your Honor. And that includes the management fees, the social worker, the therapist, the medical services. Now, this defendant is going to be serving a 204-month sentence. That's almost 20 years. Assuming we were to affirm on restitution, is that immediately charged to the defendant, or does he pay it after he serves his term? As a practical matter, what happens? I believe there was a payment fee put together in the PSR report, but I don't recall it immediately. Didn't he have retirement income coming in? Yes, Your Honor. He receives approximately $1,800 in pension benefits each month. Which could be applied to the $16,000 if that were all right. Yes, Your Honor. And I believe there was a payment fee schedule established. I would just like to sum up by echoing the words of the district court in this case. He truly believed that this was just a drop in the bucket in assistance for these children. They will suffer for the rest of their lives for having lived through this. They live in a small community, and this case was well publicized. I don't believe that in fashioning this restitution order, we were trying to increase them beyond their life situation prior to this abuse, quite simply because they don't think it's possible to do so. Thank you, Your Honor. Thank you, counsel. Mr. Libby, you have some reserve time. First, Your Honor, since there seems to be still some question about the nearly $7,000 total, just starting on page 211 of the excerpts dealing with victim number one, the cost for the caseworker fee, it's $435 for a specific caseworker fee, $15 for supplies for the caseworker, $108 for transportation costs of the caseworker, which works out to $558 for each of the eight victims, which totals $4,464. The management fee is $2,383, which is on page 218 of the excerpts, which comes to a total for management costs and the cost of the caseworker of $6,847. So that's that calculation. The government has brought up the fact that the victims were evaluated, they say three times by various people, and claimed that there was a qualified social worker who, in fact, last saw them and, in fact, developed this plan. The problem, though, of course, is the government submitted no evidence of this. There's no affidavit from a social worker indicating qualifications or how he or she developed this plan. There's nothing. The government cites to the Danger case out of the Seventh Circuit, which did impose future costs of treatment for life. Well, that case, which was a plain error case, by the way, in fact, that was based on affidavits from the treating psychiatrist, and everything was calculated out for how this restitution order was determined. The same thing with the other cases cited by the government. There was all evidence in the record that detailed very clearly from qualified professionals how this restitution was calculated. We don't have that here. Thank you, counsel. Your time has expired. Thank you. Counsel, you might proceed.
judges: Hall, O'scannlain, Callahan